Filed 11/12/24  In re W.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re W.B., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082725 |
| Plaintiff and Respondent, | (Super.Ct.No. J297258) |
| v. | OPINION |
| K.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Weissburg Law Firm, Diane B. Weissburg and Jerry A. Weissburg, for Defendant and Appellant.

Tom Bunton, County Counsel, and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent

1

Defendant and appellant K.B. (mother) appeals from the jurisdictional findings and dispositional orders removing W.B. from her custody, releasing him to his father W.B. Sr. (father), and terminating dependency jurisdiction with a custody order granting father sole physical custody of W.B. and limiting mother's monitored visitation. Mother contends there is insufficient evidence to support the jurisdictional findings. (Welf. & Inst. Code,[1] § 300, subds. (a), (b)(1).) We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. The Referral.

Mother and father are the parents of W.B. (born in 2010); mother had custody. W.B. has an adult sister, S.B., who had lived with mother and W.B. until she was 16 years old. On May 17, 2023, the San Bernardino County Department of Children and Family Services (Department) received an immediate response referral regarding physical abuse of W.B. Students at his school raised concerns about bruises on his body. When asked, W.B. said they were caused by the maternal uncle, C.P. (uncle), who hit him with a belt at mother's request. School officials called the maternal aunt, L.DT. (aunt), who took W.B. to the Fontana police station. At the station, aunt informed law enforcement that W.B. was being abused by mother and uncle. W.B. said he ran away from mother after she threatened to beat him with a belt for not finishing his school assignments. He went to aunt's house until uncle picked him up and brought him home.

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

At mother's direction, uncle beat W.B. with a belt, 20 times, on his lower body. W.B. stated mother kept him from school because of bruising.

On May 17 and 18, 2023, the social worker spoke with W.B., aunt, and father. In addition to hearing their account of W.B.'s bruises, W.B. claimed he was regularly beat for misbehaving, is afraid to go home (because mother threatens him with more beatings if he reports the abuse), is anxious, and has little contact with father. Aunt stated that on May 13 the child called her from an unknown number (mother had blocked aunt's phone number so the child could not call her) and said that mother attempted to hit him with a belt for not finishing his homework on time. Aunt endorsed W.B.'s claims and expressed concerns the abuse appears to be escalating and mother is now employing uncle to administer more severe physical punishment. Father was unaware of mother's abuse of their son.

On May 18, 2023, the social worker spoke with mother and S.B. S.B. confirmed verbal and physical abuse in the family home, saying mother would get into moods and scream and curse at W.B. Mother reported that W.B. has been out of control for the last several months, specifically not doing well academically. She admitted to using physical discipline, but denied doing so regularly. She confirmed that on May 13, W.B. was tasked with completing his school assignments, that she planned to whip him with a belt for failing to do so, that he ran away, and that he was later whipped by uncle. When asked about W.B.'s bruises, mother "continued to deflect the question and never actually answered." She expressed a preference for W.B. being placed in foster care or a group

3

home to "'teach him a lesson.'" Mother refused to allow W.B. to be medically assessed and treated.

Separately, mother was interviewed by Fontana police officers who were wearing body cameras. In that interview, mother claimed that an African-American woman showed up at her house and told mother that W.B. and another boy had jumped her eight-year-old daughter at the bus stop, and then W.B. was suspended from using the bus for "just being outrageous on the bus."

Department obtained a protective custody warrant and removed W.B. from mother's custody; aunt took him to Loma Linda Children's Hospital to be assessed.

*B. Detention.*

On May 22, 2023, Department initiated dependency proceedings pursuant to section 300, subdivisions (a) (serious physical harm) and (b)(1) (failure to protect). Specifically, the allegations stated mother has a history of using excessive corporal punishment on W.B., including hitting him with a belt that resulted in injuries, and father left W.B. without provisions for ongoing support and failed to protect him from the mother's physical abuse. On May 24, the juvenile court detained W.B., denied visitation for mother on the grounds it would be harmful to his safety, ordered unsupervised visitation for father, and set a combined jurisdiction/disposition hearing. Mother indicated that her first choice for the child's placement is father.

*C. Jurisdiction/Disposition Report and Contested Hearing.*

In its jurisdiction/disposition report filed June 13, 2023, Department recommended the juvenile court sustain the allegations in the petition and continue the hearing to allow

4

time to assess father's home for placement and follow up with the police investigation. Mother and father are divorced, and mother had been granted full custody of W.B. W.B. was doing well with his caregiver (aunt) and he did not want to see mother. He reported mother's threats and beatings with a belt, and stated he had sustained bruises as a result of being beaten with a belt (about 25 times) in May and on two other occasions. Aunt is mother's half sister (they share the same father but not the same mother); she supported her niece when she left mother's home at 16 years old. As a result, mother cut ties with aunt. When the social worker spoke with mother, she accused aunt of poisoning W.B. against mother, did not want W.B. staying with aunt, and had no concerns with placing him with father. Mother stated that she is a workaholic and failed to prioritize her son's needs, which may be why their relationship has been impacted. Mother was married to father when she got pregnant with W.B., but he left before W.B. was born and sporadically visited him. The social worker spoke with father who was willing to find housing that would accommodate W.B.

Subsequently, Department provided the juvenile court with copies of police reports and call logs regarding mother's children. In one report dated June 6, 2012, S.B. reported she had been hit with a cloth on her face and a cord on her legs; no injuries were noted. In 2006, she sustained bruising. On September 10, 2021, it was reported that W.B. had sustained bruises at mother's hands. The most recent report noted W.B.'s bruises; however, the investigating officer did not feel they were consistent with W.B.'s

5

description of being struck between 20-25 times by uncle.[2] When aunt was asked if she had additional photographs of W.B.'s injuries, she stated that she did; however, "she was not comfortable sending them to [the officer] as she did not want [uncle] to be arrested."

On July 26, 2023, the social worker went to father's apartment and observed no safety concerns. Since W.B.'s visitation with father was going well, Department recommended, and the juvenile court approved, a 29-day visit.

---

[2] According to the police report, W.B. stated that on Saturday, May 13, 2023, mother told him he had to complete several missed school assignments or she would hit him 20 times with a belt. He was scared so he left home, called aunt, and went to her house. During the night, uncle took him back to mother's home; W.B. was threatened with consequences if he woke up aunt or made any noise. At home, they went into mother's bedroom and W.B. was directed to put his hands on the front of the bed. Uncle hit him approximately 20 times with a black belt; he was told not to move his hands or block the strikes, or uncle would hit him three more times. When W.B. vocalized his pain, uncle said he would count that as an attempt to block the belt strikes. Mother watched the beating.

Law enforcement saw bruising to W.B.'s back and right thigh. Mother refused to consent to any medical assessment or treatment for the injuries. W.B. stated mother and uncle primarily discipline him with a belt, each separately having done so four to five times within the last year. Each time, mother made W.B. wear shorts so that he felt the pain of the belt strikes.

In her interview, mother explained that she had been having issues with W.B. ("ongoing problems at school such as incidents on the school bus and poor grades") because he had no father figure. He had missed several school assignments and would take hours to complete the assignments with no sense of urgency. Mother expressed concern that he could be held back a grade. She threatened to spank him if he did not complete the missed assignments, but claimed that it was only a threat. When she awoke from a nap and discovered W.B. was gone, she called uncle and aunt. After uncle located W.B. and returned him home, they discussed his behavior. Mother told W.B. he was not to go to aunt's house when he misbehaves. She believed aunt was coaching him about what to say so he would be removed from mother's home. She claimed W.B. joked about it and stated it was fun.

An officer called uncle and explained that he was investigating an alleged child abuse case; uncle replied, "'I'm not answering any questions.'" When the officer explained that he just wanted to hear uncle's side of the story, uncle told the officer to "speak to his lawyer, and he hung up the phone."

On August 30, 2023, Department informed the juvenile court that W.B. had started the 29-day visit with father, was doing well, wanted to remain there, was not interested in visiting mother and did not believe he is safe with her. Mother agreed to enroll in predisposition services. Department recommended the court dismiss the dependency with family law orders and order supervised visitation with mother when W.B. wishes to resume visitation. The court ordered W.B. remain with father.

On September 4, 2023, mother reported that she had started private counseling, but Department was unable to verify this information. Mother has repeatedly stated that she distrusts Department and the social worker, and she has emailed complaints to the social worker's supervisors. On October 16, 2023, Department informed the juvenile court that mother accepted services with Serenity on September 21, but then on October 6 she rescinded her consent to allow Department to exchange information with any service provider. Thus, Department was not sure if mother remained in services with Serenity, and it could not proceed with a referral for therapeutic visits without signed consent forms. The recommendations remained the same.

On November 14, 2023, mother moved to dismiss the petition on the grounds (1) it fails to state a cause of action under subdivisions (a) and (b)(1) of section 300, (2) there is no competent evidence W.B. suffered serious physical harm based on mother's alleged acts, and (3) the allegations against mother are unconstitutionally vague and conclusory. In the alternative, mother requested an evidentiary hearing on the issue of jurisdiction and sufficiency of evidence. She asserted there is "***no credible evidence***" W.B. has "***suffered physical abuse***" by mother at any time. She accused aunt of creating false allegations,

coaching W.B. to make statements that mother physically abused him, and alienating him from mother. According to mother, this case is a family law case and the juvenile court should not expend its legal resources, time, and limited financial expenditures on it.

On December 5, 2023, Department requested permission to allow supervised visits with mother based on W.B.'s request. That same day, the juvenile court denied mother's dismissal motion and proceeded to the contested jurisdiction/disposition hearing. The court admitted all Department reports, the police reports, color photographs of W.B. taken by officers, a transcript of mother's interview with the Fontana police officers, text communications between mother and aunt, and the May 17, 2023 medical report from Loma Linda Hospital.

Following close of evidence, mother's counsel argued the evidence is insufficient to support the allegations. He referenced an officer's opinion that W.B.'s injuries were inconsistent with his statement and asserted his claims of ongoing corporal punishment are not supported by the evidence since prior claims of abuse were unfounded. Counsel argued W.B.'s sister's claims are remote because she has not seen mother in seven years. He emphasized mother's concern that W.B. is a "13-year young African male" who is "going the wrong way," uncle's use of a belt did not result in a debilitating serious injury, only faint bruising, and W.B. was able to play basketball. According to counsel, mother simply applied a reasonable means of discipline; her intent "was one of love and trying to push [W.B.] in the right direction rather than to abuse, hurt, and neglect [him]." Counsel requested joint legal and physical custody, with W.B. returning to mother that day.

8

W.B.'s counsel argued the timeline of what happened to W.B. shows that mother's choice of discipline was abusive. Department agreed, arguing the punishment (hit with a belt at least nine times) was too severe for the crime (not finishing school assignments). Counsel called out mother's claims that W.B. was getting into fights at school and causing chaos as being suspect because there have been no reports of behavioral issues since he has been living with aunt or father. Department requested the juvenile court sustain the allegations as to mother.

Following argument, the juvenile court dismissed allegations b-3 and b-4 regarding father, but sustained allegations a-1 and b-1 regarding mother's serious physical abuse. The court pointed to evidence in the record that showed mother used a belt as a disciplinary means and W.B. was hit at least nine times. The court found that hitting a child at least nine times, if not more, with a belt in the middle of the night by a man who is quite large is not appropriate discipline. The court then dismissed the dependency case and prepared the family law order (Judicial Council Forms, form JV-200) that provides joint legal custody to the parents, and primary residence and physical custody to father. The court ordered weekly supervised visitation with mother for a period of four hours. As required under California Rules of Court, rule 5.700(b), the court stated its reasons for supervised visitation on Judicial Council Forms, form JV-206. The court explained mother has not completed individual and conjoint counseling, and reunification services for mother were denied due to custody being dismissed. Mother's counsel objected to the JV-206.

9

## II.  DISCUSSION

In this appeal, mother contends (1) the evidence is insufficient to support the jurisdiction findings, (2) Department's employees lied and withheld necessary information from the juvenile court, (3) mother has a parental right to reasonably discipline her child, (4) the court failed to determine the reasonableness of the disciplinary conduct, and (5) reversal of the jurisdiction order requires reversal of the disposition order.[3]

---

[3] At oral argument, mother faulted the juvenile court for failing to make removal findings under section 361, subdivision (c)(1).  (*In re H.B.* (2024) ___Cal.App.5th ___ [2024 Cal.App.LEXIS 683, *1, *33-*40] ["'A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence [that]: [¶]  (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.'"].)  In response, Department contends this case is governed by section 361.2, and not section 361, subdivision (c)(1).  We agree with Department.

Section 361.2, in relevant part, provides:  "(a) If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . . [¶]  (b) If the court places the child with that parent, the court may do any of the following:  [¶] (1) Order that the parent become legal and physical custodian of the child.  The court may also provide reasonable visitation by the noncustodial parent.  The court shall then terminate its jurisdiction over the child.  The custody order shall continue unless modified by a subsequent order of the superior court.  The order of the juvenile court shall be filed in any domestic relation proceeding between the parents."  Here, the noncustodial father desired to assume custody of W.B., and W.B. was placed with father following Department's approval of father's home.

*A. Jurisdiction.*

"'The purpose of California's dependency law is "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." [Citation.] In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members.' [Citation.] [¶] 'Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm.' [Citation.] '"A dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care." [Citation.] After the juvenile court takes that preliminary step, the court may impose limitations on parental authority as necessary to protect the child. [Citations.] It may also order that the child be removed from a parent's physical custody if there is clear and convincing evidence that removal is necessary to protect the child from a substantial risk of harm. [Citations.] In some cases, a dependency adjudication may lead to termination of parental rights.' [Citation.]" (*In re N.R.* (2023) 15 Cal.5th 520, 537.)

11

Relevant to this case, the juvenile court may adjudge a child to be a dependent of the court under section 300, subdivision (a) ("the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent") and subdivision (b)(1) ("there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . . [¶] [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child"). Here, the court sustained the allegations in the petition under both of these subdivisions, and the allegations are essentially the same—there is a substantial risk that mother will inflict serious physical harm on W.B. Because the factual basis is the same, and we may affirm a jurisdictional ruling if the evidence supports any of the counts, we will discuss the allegations that support jurisdiction under section 300, subdivision (a). (See *In re Christopher C.* (2010) 182 Cal.App.4th 73, 83 [juvenile court's jurisdiction may rest on a single ground]; see also *In re Tracy Z.* (1987) 195 Cal.App.3d 107, 112-113 [single finding sufficient to sustain jurisdiction].)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the [juvenile] court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601-602 (*Cole L.*); accord, *In re L.O.* (2021) 67 Cal.App.5th 227, 238 ["'Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection.'"].) The court may consider past events in deciding whether a child presently needs the court's protection

and a parent's "'"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.'" (*Cole L.*, at p. 602; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1048.) We apply the substantial evidence test to the juvenile court's jurisdictional findings. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) "The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.)

    1. Sufficiency of evidence.

Mother contends there is insufficient evidence to support a conclusion that W.B. suffered, or there is a substantial risk that he will suffer, nonaccidental serious physical harm at her hands. For purposes of section 300, subdivision (a), "'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury." (§ 300, subd. (a).) "'Nonaccidental' generally means a parent or guardian 'acted intentionally or willfully.'" (*Cole L.*, *supra*, 70 Cal.App.5th at p. 601; see *In re R.T.* (2017) 3 Cal.5th 622, 629.) The juvenile court determines whether the jurisdictional allegations are true based on a preponderance of the evidence. (§ 355.)

According to both of mother's children, she uses objects (a cord, a belt, her hand) to hit them as a form of discipline. S.B. reported she and W.B. were subjected to daily physical abuse by mother. (*In re Y.G.* (2009) 175 Cal.App.4th 109, 114-116 [mother's physical abuse of unrelated same-age minor supported jurisdictional finding of risk that mother would physically abuse her own child].) Regarding her most recent discipline of W.B., it is undisputed that mother directed uncle to hit W.B. with a belt (at least nine

13

times) for failing to complete his missing school assignments and running to aunt's house. Mother admitted that conduct and W.B. confirmed it. The initial examination (conducted by the Fontana Police Department four days later) revealed bruising on W.B.'s back and right thigh; pictures of the bruising were taken. Moreover, the forensic medical examination of W.B., conducted five days later, on May 18, 2023, documented the bruises on his leg. Given that mother confirmed W.B.'s claims of similar spankings with a belt by mother or uncle, we conclude that W.B. suffered serious physical harm inflicted by, or at, mother's direction. (See, e.g., *In re Mariah T.* (2008) 159 Cal.App.4th 428, 438 [mother's use of a belt to inflict "deep, purple bruises" on child supports jurisdiction]; *In re David H*. (2008) 165 Cal.App.4th 1626, 1645 [mother's repeated use of belt to inflict "bruises, linear red marks, welts and broken skin" supports jurisdiction].)

*2. Information in Department's reports.*

Mother faults Department for misrepresenting (1) her history of disciplining her children (which claim she has repeatedly physically and emotionally abused the children), (2) the social worker's inability to communicate with her via cellphone or email, and (3) her participation in services. Regarding mother's use of corporal punishment on the children, the social worker obtained this evidence from W.B. and S.B. To the extent there is a conflict between mother's and her children's descriptions of her disciplinary measures, we do not judge either's credibility. Credibility evaluations are the sole province of the juvenile court. (*In re Nathan E.* (2021) 61 Cal.App.5th 114, 122-123.) As for the claim Department was unable to contact mother via a cellphone or email, we note Department admitted its misrepresentation on the day of the

14

jurisdiction/disposition hearing and we did not include the misrepresentation in our recitation of the facts. Finally, regarding mother's claim that she voluntarily completed eight weeks of individual therapy and 12 weeks of a parenting course, the record is void of any evidence to support her claim. As we previously stated, on September 4, 2023, mother reported she had started private counseling, but Department was unable to verify this information because she rescinded consent for Department "to exchange information with [the] provider."

       3. Parental disciplinary privilege.

Mother contends she has a parental right to reasonably discipline her child, spanking is not her primary method of discipline, spanking W.B. with a belt in this case was reasonable parental discipline (she alleges he physically assaulted an eight-year-old girl, verbally assaulted the school bus driver, and ran away from home), and the juvenile court failed to engage in a careful determination and weighing whether the discipline administered by mother was a reasonable or justifiable exercise of parental rights. (See, e.g., *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 93-94; *In re D.M.* (2015) 242 Cal.App.4th 634, 641-642.) Although we agree that mother has a parental right to reasonably discipline her child, we do not agree that her use of the belt in this case was reasonable parental discipline, or that the court failed to apply the proper legal standard.

First, although the juvenile court may not have explicitly determined and weighed whether the discipline administered by mother was a reasonable or justifiable exercise of parental rights, the record demonstrates the court's true finding was based on whether the

15

discipline was reasonable in kind and degree. As the court stated, "[U]nder the circumstances, I do not believe based on the law that having a child hit at least nine times, if not more, with a belt in the middle of the night by a man who is quite large, is appropriate discipline. I believe that it puts [W.B.] at risk under the [(a) and (b)] sections.· [The (a)] allegations frankly don't even need injuries, but in this case, we have not only injuries but an agreement that the child was hit by his uncle with a belt multiple times."

Nonetheless, mother faults the juvenile court for making unsupported assumptions about uncle's size when he "was never allowed to attend the dependency court hearings, as he was not a parent, legal guardian, or custodial relative." Despite uncle's absence, the record contains evidence of his size: Fontana Police Department records indicate uncle is "6'09" tall and "280 lbs.," and mother described him as being "seven feet tall." Moreover, contrary to mother's representation, California law does not prohibit uncle from attending any dependency hearing. (§§ 345 [parents, guardians, and *relatives of the minor* are permitted to attend dependency hearings] & 346 ["public shall not be admitted to a juvenile court hearing"].) Rather, his absence was by choice, possibly motivated out of concern that he could be arrested for hitting W.B. with a belt. Again, aunt stated that she was in possession of additional photographs of W.B.'s injuries; however, she "was not comfortable sending them to [the police] as she did not want [uncle] to be arrested."

Second, in urging us to hold that her conduct falls within the bounds of reasonable parental discipline, mother minimizes and dismisses evidence suggesting that she did anything other than allow uncle to hit W.B. a few times with a belt. But as already

16

explained, the evidence shows extensive bruising on W.B.'s back and thighs five days later. Although W.B.'s accounts varied regarding the number of hits he received, there is substantial evidence that mother's disciplinary measure caused significant bruising on the day in question. Moreover, after W.B. was removed from mother's home, he refused to visit her and reported that he did not feel safe with her, suggesting he was traumatized by the physical abuse. Mother's insistence that we discount this one incident in favor of W.B.'s prior denials of any allegations of abuse ignores our standard of review. Our task is to determine if substantial evidence, contradicted or uncontradicted, supports the court's findings. "'"We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Finally, we agree that any inquiry regarding reasonable discipline versus child abuse requires a fact-specific analysis; there is no one-size-fits-all rule. Likewise, we agree that some courts have said that the use of a belt or a shoe *may not* constitute abuse, as opposed to appropriate discipline. (See, e.g., *Gonzalez v. Santa Clara Dept. of Social Services*, *supra*, 223 Cal.App.4th at p. 92 ["We cannot say that the use of a wooden spoon to administer a spanking necessarily exceeds the bounds of reasonable parental discipline"]; *In re D.M.*, *supra*, 242 Cal.App.4th at p. 640 [holding parent's spanking of her children on the buttocks with her bare hand and with a sandal did not categorically constitute "'serious physical harm'" sufficient to invoke dependency jurisdiction].) However, "dependency jurisdiction has been sustained when a parent hit her three year old on the stomach with a belt, causing deep, purple bruises after he refused to write a

17

letter of the alphabet and sprayed perfume in his eyes (*In re Mariah T*. (2008) 159 Cal.App.4th 428, 438-439); when a parent hit her son with a belt and an electric cord 21 times because he was misbehaving, causing bruises and leaving red marks, welts, and broken skin (*In re David H.* (2008) 165 Cal.App.4th 1626, 1645); when a parent struck his daughter, dislocating her shoulder (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433); when a parent struck her son with 'hard objects, violently enough to leave black and blue bruises' for unexplained disciplinary reasons (*In re A.E.* (2008) 168 Cal.App.4th 1, 3); . . . ; and when a parent, to control his daughters' behavior, repeatedly sprayed them with cold water from a hose, pulled their hair, used ice packs, and also indicated a plan to use 'harsher disciplinary techniques' with his son (*In re Cole C*.[, *supra*,] 174 Cal.App.4th [at pp.] 916-917)." (*In re D.M.*, at pp. 641-642.) The present case is similarly serious, given the fact that W.B. has entered into the trying teenage years, mother claims his behavior is escalating (despite no evidence of bad behavior since he went to live with father), her use of a belt to discipline him (at least four to five times during the last year), her indirect participation in disciplining W.B. by having uncle use the belt (at least four to five times during the last year), and the extensive bruising sustained in the most recent incident. (Cf. *In re T.R.* (2023) 87 Cal.App.5th 1140, 1150-1151 [excessive corporal punishment supports both jurisdiction and removal because the child is in danger of suffering serious, nonaccidental physical harm within the meaning of section 300, subdivision (a) and it is not currently safe for him or her to return home].)

In short, mother's use of the belt under the facts of this case was excessive and not reasonable.

*B. Disposition.*

Lastly, mother contends that if we reverse and vacate the jurisdiction findings and orders under section 300, then the subsequent dispositional orders must be reversed as well. Having affirmed the jurisdiction findings, this issue is moot.

## III. DISPOSITION

We affirm the jurisdictional findings and disposition orders.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER  
Acting P. J.

We concur:

CODRINGTON  
J.

FIELDS  
J.